Case No. 13-1093 et al. Delaware Department of Natural Resources and Environmental Control Petitioner v. Environmental Protection Agency Mr. DeBruin for Petitioners PSEG Power et al., Ms. Edge for Petitioner DDNR, Mr. Saylor for Respondents, and Mr. Wareham for Intervenor Respondents. Mr. DeBruin. Senator, with court's indulgence, I will go first, if that's permissible. May it please the court, my name is David DeBruin, and I represent both the Conservation Law Foundation and the Electric Generating Company Petitioners. In this case, it is the Environmental Protection Agency that is fighting to exempt dirty and environmentally harmful diesel engines from otherwise applicable pollution controls so that those engines can participate in organized electricity planning markets, an exemption that was not sought by FERC, the Reliability Organization, NERC, or any of the grid operators that are charged with keeping the grid running, and that EPA itself now concedes is not necessary for that purpose. The 2013 rule should be vacated for three principal reasons. First, EPA has abandoned the rationale in the rule for increasing from 15 to 100 hours the amount that a diesel engine may operate as part of a demand response program. Second, there is no support for EPA's assertion that the increase in permitted use from 15 to 100 hours will not lead to any increase in the operation of those engines, and the record evidence shows just the opposite. And third, it was arbitrary and capricious for EPA to disregard its fundamental statutory duty  You talk about convenience as if it were something that is to be slighted, and I grant you that in a huge number of environmental cases that is true, but this is under a statute which directs the consideration of cost, and inconvenience is a cost. Inconvenience is not only a cost, but a cost that may have consequences. Senator, what is significant is the convenience that I was referencing is not the convenience of the operators of the diesel engines, and I submit that cost is not a factor in this case because the issue is not whether those controls should apply, but whether these engines are properly classified as emergency engines. In other words, the issue is not whether the pollution control should be applied on these engines, but whether it is permissible to classify the engine still as an emergency engine if it operates for up to 100 hours in an emergency demand program. Per year. Per year. What I submit is irrational for the agency was to rely now on the convenience of demand response aggregators, but it's easier not to have to aggregate engines. I assume aggregators are happy to aggregate. Well, but the argument that has been made by the respondents is that this increase in hours is permissible because it is more convenient for those who aggregate demand response to not have to aggregate multiple engines, but instead can rely on the fact that... I thought it was the proposition that aggregation entails cost, and I think in your reply brief you say, well, that's something that the aggregators bear, so it's still a cost. I don't understand the argument at all. Well, it is, but, Your Honor, there is no reason the record shows to exempt dirty, environmentally harmful diesel engines from cost just to enable them to participate in energy planning markets. What the evidence shows is that by allowing these engines to participate in planning markets, capacity markets, it is, in fact, more likely that these engines will be used, thus increasing the environmental harm resulting from the engines. If the engines can be used within the meaning of the rule only for emergency demand response, in other words, that creates a ceiling on the use. Why is it the rule is going to generate this runaway market where everything turns into emergency? Emergency seems to be, under the EPA's rule, a discreet proposition. Well, two principal points, Your Honor. First, the record shows that although the EPA increased from 15 hours to 100 hours, there already have been numerous instances where alert conditions have existed for more than 15 hours, 16 hours in Connecticut up to close to 40 hours in the New York region. So already there have been more alert hours than the 15 previously allowed. But secondly and more significant, the independent market monitor, for instance, for the PJM region testified that the mere fact that EPA is allowing increased use of these engines in planning markets will increase the number of emergencies that are likely to occur in the future, significantly increase. And I would direct the Court to Joint Appendix, page 1706, where, again, the independent market monitor testified at an EPA hearing, and I quote, as I noted, as the amount, total amount of demand side and significance in the market goes up, the number of so-called emergencies is going to go up. And as he further explained that, I mean, if emergency depends on compliance with discrete pre-stated characteristics. Correct. I mean, you're saying the RTOs are going to fudge? I mean, that sounds like. No, Your Honor, I don't see how without fudging that happens. And what is critical is that in the 2013 rule, EPA increased the total number of hours these diesel engines could operate so they could participate in planning markets. Those are the very markets that are used to identify what resources will be available in the future when need is called upon for resources to operate. And in this case, specifically, for emergency uses. Correct. The independent market monitor. There are parts of your brief that suggest you are contesting the proposition that it is useful in terms of organizing resources for emergencies to have a clear entitlement to the resource. That would seem to me almost self-evident. I mean, self-evident. Strike the almost. Your Honor, we have not challenged the use of these engines in an actual blackout situation. Right. The question is. Can I interrupt you there? I'm not clear about this. If there is an actual blackout, does that count against the 100 hours? In other words, if the blackout lasts longer than 100 hours, you have to shut the generator down? No, Your Honor, there is no limit on the use of engines in an actual blackout. What I would characterize as a true emergency situation. There's no limit. No limit. And we don't challenge that. And in the 2010 rule, EPA allowed 15 hours of actual operation, operation essentially in the energy market, the real-time energy market, in alert level 2 conditions that precede an actual blackout. But what they did in the 2013 rule was to take that limitation of 15 hours and to increase it to 100 hours, but significantly for a very different reason. Not to allow the engines to operate, but to allow the engines to participate in the planning market. They couldn't have under the 15-hour rule if that ever went into effect. Is that because ISOs like PJM required at least 60 hours of operation before you can participate in the auction? That is correct, although the 60 hours can be aggregated by demand response aggregators, so that theoretically different engines could be aggregated and still participate in the planning market. But what EPA's increase, and they justified the increase only on this round, makes it easier for single engines, diesel engines, to participate in the planning that is made for what's going to be needed three years down the road. And what the independent market monitor explained is the more you rely upon these engines for planning, they become part of the fabric and will actually lead to an increased number of emergencies. Why is that? I thought your dynamic market argument was that if you remove the requirement of controls, these will be cheaper than they otherwise would, and therefore compete unfairly with the other cleaner sources that might get into this market. I understand that argument. I'm not following why there will be more emergencies than there were. First of all, the point you make is exactly right. It distorts the market for any number of hours they operate in the planning market. The problem is these are demand-side resources. They're not actual generation of electricity. They are behind the meter, in this case, engines that are operating. So if your planning parameters rely increasingly on not generation but the withdrawal of use, so you have less actual generation in the market, what the independent market monitor explained is because you have less generation that has been planned for, you are more likely to hit a situation where you don't have adequate actual generation. So less generation planned for because people – people, I mean these word people – know that this other is available? Is that what you're saying? For the very reason you said. You've given essentially these diesel engines a cost subsidy. They don't have to comply with environmental controls. The record shows that increasing amounts of this demand-side resource is prevailing in the planning market and therefore displacing other types of real generation that otherwise would be available when capacity is needed. That is why the independent market monitor says the concern here is there will be more alerts in the future requiring the use of all the resources in the market. That's actually the demand-side resources that are increasingly prevailing in the market and that's why the increase in the use of these engines will go up. But it critically gives a competitive advantage to these engines that operate without controls to displace other sources that operate with controls. The traditional generation – the generators will not be as – they will begin to disappear. Is that the idea? Correct. So in the planning market, a certain quantum of electricity is claimed to be needed. That consists of both how much will the grid likely need plus the reserve margin. Is there any economic analysis in the record, in the rulemaking to support that proposition, the one that I just – I think in some ways the best economic analysis is what I'm referring to, the testimony of the independent market monitor, 1703 through 1706 in his testimony in an EPA hearing. He also submitted comments, which are in the record at Joint Appendix 2337. The operation of these markets, I believe, is also set forth in the comments of Calpine at 2354. And you say EPA never responded to those comments? EPA did not. It simply accepted the false predicate, first of all, that 100 hours or at least more than 15 hours was needed for these resources to participate in the capacity market. And secondly and critically – I think it's to an extent needed. It seemed to me it was argued that it would raise the cost and thereby indirectly increase risks of unreliability. Sorry. What EPA said is – Need is one of those incredibly slippery terms. Probably best just to disregard it. Well, EPA in the rule justified the increase in hours on basically two grounds. It said we need to allow more than 15 hours of use so that these engines can participate and that participation is needed to ensure reliability. And what is significant is that the increase in hours is only needed to allow the engines to participate in the planning market. There are two markets. There's an energy market, a real-time, day-ahead energy market, and there's a planning market that operates basically in the future. These engines can operate in the energy market without the same number of hours restriction. So when EPA says there are limits on the number of hours that these engines must be able to operate to participate in the market, those limits only exist in the planning market. And that is explained in the record in several places, which I can cite to the court. Does the passage of 1703-06 cite comparable examples? I mean, I understand the theoretical argument, but some theories are the whilst of the wisp. Others have clear precedents showing responses of the type predicted. But the point, Your Honor, is there's no... Is that the answer to my question? Yes, I believe that difference. I would direct the court to the EPSA comments, Joint Appendix, page 22-28, to the Calpine comments. The difference in these markets are explained. What is significant? No, I understand the difference in the markets, but what I'm questioning is the proposition that you will have this secular shift away from, let's call them regular suppliers, thereby increasing the quantity of emergencies. Well, the best... I would, in particular for that, direct you to 1703. That's why I asked you what my specific question was, to get back to it. Does that passage, articulated as a sort of general principle, which often is enough in economics, or does it actually cite some sort of experience that would back it up? Well, we know in the record that there is increasing amounts of demand resources that are emerging and prevailing in the capacity markets. Demand resources? These, yes, these... Demand response resources. Demand response resources. Right, right. But that's different from emergency demand response. Some of the passages that you cite seem to refer to demand response generally rather than emergency demand response. Well, when, for instance, PJM calls upon demand response to operate in the energy market, that is essentially the same emergency demand response that EPA has authorized here. It's effectively an alert to, it is not a blackout condition... I'm sorry, you're saying any demand response obtained by PJM is emergency demand response? No. Then the adjective is unneeded. What is at issue in this case is the emergency demand response that PJM calls upon, other grid operators call upon. Right. And that is what EPA has allowed in the exemption for now up to $100. Yeah. That is the demand response that we're talking about. Right. There may be other demand response programs, so-called economic demand response. That is not what we're focused on here. It is a critical point. There is no dispute that these engines are harmful to the environment. They have environmental control that would otherwise apply. And the only reason EPA has exempted these engines from those requirements is under its perceived belief that that's necessary to allow the engines to participate in the planning process, and that that participation is needed to maintain the reliability of the system. If we abstract the word needed for the moment and reformulate it to a proposition that not allowing the participation in the capacity market will make it harder for an RTO to be sure of the availability of this emergency demand response. Right. And that is what- As I understand it, you concede that. It will make it harder. It will make it more costly. No, absolutely not. And, again, PJM in its comments made clear that this exemption was not needed to maintain the reliability of its grid. And I can direct you to the page for that. Not FERC, not NERC. No one apart from EPA made the argument we need an exemption of $100. Did FERC participate in any way in this proceeding? It did not. My point simply is those agencies that are properly charged for maintaining the reliability of the electricity, which is FERC, which is NERC, which are the grid operators, none of them were going to EPA saying we need an exemption to maintain our systems in a reliable way. I didn't say either way. This is instead the Environmental Protection Agency. Is there a way by which EPA could have solicited the views of FERC or NERC? Well, I believe they could, and there is participation in the record from grid operators, PJM, other entities. I would direct the court as to PJM. Their comments at Joint Appendix 1791 where PJM stated, as a result, the environmental limitations on individual rice units, although an important input into how demand response resources are deployed, are not necessarily dispositive of the ability of demand response resources to participate in PJM's markets or to maintain bulk power system reliability. And in their brief today... So the initial... This is one thing I am confused about. Perhaps you can tell us the real answer, but why is it that PJM's... their 2011 comments seem contradicted by their 2012 comments? That's accurate, isn't it? They at least appear contradictory. I think there was some, again, confusion with Parkinson's as to the way this rule evolved. So in the original proposal for the 2000... for what became the final 2010 rule, EPA had no exemption for... by which these engines could operate as part of an emergency demand response program. In the 2010 rule, for the first time, EPA allowed 15 hours of use, of actual use and operation as part of a demand response program, ultimately leading to comments, and then finally it put out the specific proposal that became the 2013 rule. PJM's comments that I cited were directed to the actual rule that EPA ultimately promulgated. Before you sit down, is it accurate to say that states can impose more stringent controls over these generators than EPA has? I believe it is accurate. So a state could say, I don't care, a hundred... We can always impose more stringent environmental requirements in our state implementation plan, for example, so we say ten. Can they do that? States, I believe, can impose controls, but what is at issue here is EPA is charged with administering the Clean Air Act. It has an obligation to do that. There is no dispute that these engines otherwise should be controlled. EPA has imposed controls. The only reason it exempted them was based on the rationale it is now abiding in, which was that that exemption was needed to maintain system reliability. Do you know whether states, through this rulemaking, have enacted regulations or state implementation plans that limit these generators to, say, 15 hours? I believe California has perhaps prohibited the operation of these diesel engines without control. I'm not aware of any other state outside of California that has done that. But again, the issue here is whether EPA has fulfilled its obligation under the Clean Air Act. I understand that. They're setting a floor, a ceiling. Right, but they have a statutory obligation to apply the statute that Congress has enacted. There's no doubt these controls are appropriate. And again, what is significant is EPA, in their brief, has now abandoned the rationale and rule. That alone is enough to require that the rule be remanded back to the agency. Which rationale, precisely? Well, the basic rationale that this increased six-fold increase in allowance. What EPA said is, absence of that increase, the system is at risk. And you're saying now they acknowledge it by aggregation. This could be resolved. Well, not just that. They recognize, and this is in their brief at page 39, where they say, in organized capacity markets, electric grid reliability could potentially... Where are you on page 39? At page 39 of EPA's brief. Right, that's where I am. Okay. EPA does not dispute that. I'm seeing it. Top of the page, bottom of the page? Let me ask you. I have it quoted in my notes, so let me... I'm sorry, page 40. My apologies, Your Honor. My notes are wrong. EPA does not dispute, yes. EPA does not dispute that. In organized capacity markets, electric grid reliability could potentially be supported in ways other than operation. Potentially. Other than operation of emergency engines. But again, it's in organized capacity markets. Those are the very markets that EPA said why it granted this exemption to allow these engines to operate in organized capacity markets, which it said had requirements that engines operate for potentially 60 hours, and they cited PJM as an example of that. So they based the rule on requirements in organized capacity markets, and they said we need to increase the limit to maintain the grid in citing the requirements of organized capacity. Can we just look at that sentence carefully? Grid reliability could potentially be supported in other ways. Okay. Now, that doesn't address the question of what the cost of doing so would be, and it also doesn't address the question of what the reaction of RTOs would be to the increase in cost. But, Your Honor, what's critical, and it's undisputed... Just before you go to that, could you say where those two sentences of mine heard? Well, one, I read to you just a minute ago PJM's comment in 2012 stating that these, an exemption from these environmental controls is not needed to maintain all the power in the PJM grid. Yeah, I... But, Your Honor, what is significant is there is no dispute that we have ample capacity sources that participate in the planning market, far more than we need, and that is in the record. And so the question becomes... Are you now talking about emergency or not emergency? We seem to shift between them at will in a very confusing way. Your Honor, the point is there is a universe of options that can be used to imply grid reliability. One of those options is emergency demand response. Other options are nuclear power plants, coal plants, gas plants. And in the planning market, all of those resources compete. And most of those resources are subject to environmental controls that are part of their cost of operation, and when they participate in the market, they take those costs into effect. Now, in that three-year-ahead planning market or whatever the planning market parameter is, these exempted engines that don't have pollution control, that actually are extremely dirty and harmful... Right. ...a single engine, participate in that same market. Their costs are lower. If they prevail in that market, other resources that could have provided power... The actual sale, the draw of power for which the RTO has paid a capacity charge can occur only in the existence of an emergency. So as I understand it, it's critical to your argument, as I now understand it, that RTOs will shift down in their use of regular supplies and therefore increase the probability of emergencies. Well, there are two different points. That is critical, is it not? Yes, but it is an important point. It's not merely important, it's essential. It's an essential point, too. It's an essential point. But what is important, and I want to make sure the court understands, there is a planning market. We call that the capacity market. Then there is what we call a real-time energy market... Yes. ...which is what actually is called upon day by day... Yes. ...to make sure we have enough electric power. EPA created an exemption to allow these diesel engines to operate in the planning market. Right. And the point that the independent market monitor made is when you decide when you're planning which resources you're going to rely upon, and one of those resources you said we'll rely upon is emergency demand response, these behind-the-meter diesel engines... Which we'll rely on in an emergency. ...to the real-time energy market, and you need to call upon the resources. Obviously, those resources that have prevailed in the planning market are more likely to be the ones that will be used. Where in the record is there evidence that the backup generators using diesel fuel can supply energy at a lower cost than a regular gas-fired turbine generator? Well, the evidence in the record is that's what the capacity market decides. In other words, whoever prevails in the planning market... You would think there's economies of scale here and that a very large generating plant would operate much more efficiently and cheaper than a single diesel-powered generator given the cost of diesel fuel. That is true, and I can't cite you the case. The record evidence does show that, for the most part, the diesel engine is not competitive in an open competitive market with other sources of power or even with conservation-based demand response, which is another type of demand response which provides the same reliability benefits but doesn't involve environmental harm with these diesel engines. But when the EPA says, we're going to give you 100 hours and you can participate in the planning market, the evidence shows that emergency demand response is increasing in the capacity market. The amount that is prevailing in the competitive open market capacity market in which everyone makes a bid... And we'll find that at 1703-06. Well, no, what you find at 1703-06 is an explanation of why these resources are more successful in the planning market because their costs have been held down by EPA because they're... They're more successful than they otherwise would be. ...than they otherwise would be. The evidence shows in the record... But the premise of that is that their cost is less, isn't it? And that's what I'm asking you. The cost is less than it would be if they had to comply with environmental... Well, I know that, but if they're still supplying energy at a higher rate than a nuclear power plant, then it's going to have no impact, is it? Well, but the evidence in the record shows that they are, in fact, prevailing in the capacity market at significantly greater amounts than has been the case. Is that true throughout the country, or is it true only in rural areas? Well, it's true in markets that have a planning market that operates this way in California. The planning market works differently in terms of bilateral contracts. But what's significant is EPA justified this increase from 15 to 100 based upon the requirement of organized capacity markets like PJM, ISM New England, and, in fact, the only example they cited in the 2013 rule was PJM's requirement that 60 hours was needed for these engines to participate. But, again, that participation in the planning market... Your argument about the question that Judge Randolph was raising, that this has to do with building new plants, bringing in new resources, and there's a big upfront cost to that, and if they see that the diesels, which maybe building a new diesel would be expensive, but here the only question is whether they're going to operate under emergency situations, that that would be lower? Absolutely. The whole reason we have a planning market is so that we can, based upon the revenues that are earned in the planning market, develop whatever resources are most competitive. So oftentimes a resource will participate in the planning market that doesn't even yet exist. But if it can make a bid, it is successful, and if it is cost-effective, then it might go ahead and build a plant, or a conservation-based DR... Is this a bid for what it will be able to charge in the event of a real emergency, or is that a separate thing? The amount that's actually charged in an emergency is determined by what we call the real-time energy model, the day-to-day energy model. So there's no advance agreement as to how much you'll be able to charge in a real emergency? That's correct. That's determined by the market dynamics... At the time. ...energy market at the time. That's not what we're talking about here. But it appears that EPA, in granting this exemption, failed to appreciate the distinction between the planning market and the actual energy market. In the 2010 rule, it said, we will exempt 15 hours of operation. If you look at the language in the 2010 rule, it is, we will allow 15 hours of operation to avert these potential blackout conditions. In the 2013 rule, they said we will allow 100 hours to allow participation in the planning market. That's what distorts the market, freezes our conservation-based DR, and it's simply irrational. There's no reason to exempt these engines from environmental controls for that reason. No further... We're going way over time. I appreciate the thought. All right, we're answering our questions. Perfectly permissible. Now we'll hear from Delaware. May it please the Court. My name is Valerie Edge, and I'm a Deputy Attorney General with the Delaware Attorney General's Office, and I represent the Delaware Department of Natural Resources and Environmental Control. Delaware DENREC is here today because air pollution makes people sick, and EPA's regulatory changes will increase air pollution. Has Delaware passed any regulation laws or state implementation plan that restricts the operation of these backup generators? Yes. And what is the restriction? They are not allowed to operate in the demand-response market. If I may... Which is why, for standing purposes, you only talk about pollution from other states drifting over Delaware, not pollution within Delaware. Because Delaware can adopt a regulation and has. However, it does... Delaware has to make up for the pollution with its... It has to attain a certain amount of restrictions in order to attain the max. And currently, for ground-level ozone pollution, 90% to 94% of the pollution that causes Delaware's nonattainment comes from out-of-state. Are you part of the transport system? We are. We're dramatically impacted by transport from out-of-state. If you dropped the dome over top of our state, our air would be incredibly clean. But the winds blow prevailingly from the northeast. No one disputes that Delaware has already well-controlled all of its sources, and it still fails to attain. EPA's emergency exception will allow sources to participate in emergency demand-response programs that, in the PGM market, have jumped to 14 gigawatts of power by aggregating these small units to create virtual power plants that turn on and blast high levels of hazardous air pollution, NO2, VOCs, and particulate matter. As my predecessor was trying to explain to the court, these aggregators are not turning on the generators to produce power for the grid. They're taking load off the grid. So what they do is flip their switch, and these generators come on, reduce the load off the grid, and are paid as if they're generating power on the grid. And so their pollution is in addition to the load that's being experienced at that time. It's usually the times of highest use and when pollution load is most serious, those hot summer days in the summer where we're already having ozone alerts, and they're the things that spew pollution to push Delaware into unhealthy air quality, which costs its citizens money. With respect to the subcategory and the Rice Knee Shop, which EPA created a subcategory which exempts engines from controls based on the premise that the engines may not be manned, may not have electricity, and may cost more to access. However, what they substituted was engine maintenance, changing the oil, changing the spark plugs. This is nothing to reduce pollution. The after-controls, the amount of maintenance that would have been required, would be visiting the site once a year to check a heat switch, and running a 15-minute test with a portable analyzer. The type of controls that they're installing are the kind of catalytic converter that your car has. According to EPA's analysis, that one change results in up to $1 billion a year in lost health benefits. That means people's health may be harmed at a cost of up to $1 billion a year. This subcategory does nothing more than shield 91% of the stationary SI rice from installing controls that EPA found to be cost-effective just three years earlier in 2010. According to Natural Resources Defense Council versus EPA, EPA may not create a subcategory whose only purpose is to shield a source from installing controls. EPA's justification for creating that remote area subcategory is not rationally related to its finding that cost to access the site may be more. And its definition is so unrelated to remote areas that you could line a string of generators up the center of New York's Central Park, and they would spew hazardous air pollution and criteria pollution because they're considered remote sources that are too expensive to access. That definition is arbitrary, capricious, and against the statute, and it should be vacated. Going back to the emergency exception, specifically with respect to the NSPS, the New Source Performance Standard, EPA's failure to take action under Section 111 is procedurally and substantively flawed. Had EPA taken action under Section 111 which deals with criteria air pollution and Delaware's ozone problem and NO2 standards, EPA would have had to take seriously our concerns about the enormous amounts of criteria pollution that are emitted from these generators. When those generators come on in the PGM area, Delaware submitted information that their emissions can total, so double the amount of criteria pollution being emitted from the existing energy market. In these times when EPA is moving towards shorter one-hour standards, EPA's posture that these rule changes will not have any real impact because their use will only be for a few hours in only remote areas that are based in assumptions and faith rather than real data or analysis is strikingly in contrast to its obligations under the Clean Air Act to protect health. EPA's substitution of management practices that require the same or more access to units based on the fact that it costs more to access those units is facially contradictory and will take a rule that would have had up to $1.3 billion in health benefits a year and reduce that to up to $300 million of health benefits a year and potentially change the cost-benefit analysis of the rule to a negative calculation. Further, EPA has refused to do any analysis of impact to determine the effect on air quality after the expansion of the emergency definition. EPA's actions are outrageous, and this Court should vacate the emergency definition changes in the MSPS and the NESHAP and the remote areas of category. Further questions from the bench? Thank you. Mr. Saylor? Good morning. May it please the Court, Austin Saylor on behalf of the U.S. Environmental Protection Agency. With me at council table is Sheila Igoe with EPA's Office of General Counsel. Your Honors, EPA has refined the subcategory of emergency engines to allow those engines to operate in two narrowly defined near-blackout situations. And that operation is subject to the already existing 100-hour annual limit on maintenance and testing of emergency engines. EPA's rule is a reasonable exercise... Let me ask you with respect to the organized capacity markets for the 100-hour rule. The rule in the Federal Register, to the extent it references any support for the proposition that more time is required, relies on PJM's emergency response requiring 60 hours, right? I believe that's correct, yes. And if I look at the 2012... I see support for that in the 2011 submission by PJM. I don't see support for that in the 2012, and I see outright rejection of that in the comments of PJM's independent market monitor. But I don't see any response by the agency to the fact that PJM seems to have a different view in 2012 and no response to the independent market monitor. With respect to the 60-hour minimum required... Yes, whether aggregators would be sufficient, et cetera, right. This strikes me as something that is somewhat outside the area of competence of the EPA, and yet you have two entities that have some competence, both of whom submit something to the contrary, and EPA doesn't respond at all. How can that be? Well, first of all, Your Honor, I think, just to take a step back, the notion that EPA's rule is premised on what happens in capacity markets, minimum availability requirements for those markets, is not supported by the record. What is it based on then? Well, Your Honor, it's based on, in addition, local grid reliability concerns in isolated or... All right, so if you can answer this one first, and then we'll get to that one, because I have a big question about that one too. Okay, so what about this? So what is the support for the proposition that it, rather than use needed, which Judge Williams reasonably raises a question about that, it justifies an exception in organized capacity markets when the only entities that we sort of rely on for this purpose you don't answer. You rely on PJM, then PJM says, well, actually, no. And then the independent market monitor says way more than just no, like they say, heck no. Well, I didn't understand that PJM said no, that 60-hour minimum is not relevant. I think what PJM said was, yes, these aggregators can bundle their sources to meet the minimums. Right, and they don't say that we need some kind of reduction in order to make it less costly, efficient, or any of those things. They seem to have changed their mind, and I would take the more recent being the one that governs. Whether or not they're right about that, how can EPA not respond to that? And how can they not respond to the independent market monitor, which says that some have asserted that an exemption for rice generators participating in demand response programs provides benefits to the organized wholesale electricity markets. Those arguments have no merit. On the contrary, providing an exemption will have negative consequences for efficiency and reliability. The exemption would create harmful incentives and aggravate the impact of design flaws in the wholesale market. The exemption conflicts with and would undermine the demand side of the markets. The assertion that the exemption is required in order to support grid reliability is entirely without support. So my first question is, why is there no response to that? Your Honor, I'm not entirely certain there is no response. Can you point me? I couldn't find any, but if you point me to one, that will answer the question. In my notes, I don't have a citation for EPA's specific response to PJM's letters. I know EPA considered both the 2011 and this one. I guess we need a high principle of our administrative laws that important comments have to be responded to, otherwise the agency is acting arbitrarily. You don't disagree these are important comments, do you?  EPA considered minimum availability requirement in capacity markets. I know you have a fallback argument, which I'm going to face in a second. But if you think that they were responded to somewhere, it would help if you would submit a one-sentence letter after this argument telling us where in the JA, because we were unable to find it. Now we'll switch to your second argument, which I take to be the one that you reference, among other places, in your September 24, 2014, 28 JA letter, where you say, EPA's decision to refine the subcategory parameters to increase the number of hours allowed for emergency demand response was informed in large part by grid reliability issues in areas of the countries not served by organized markets. That's correct. So if that's the case, why not have a rule just for grid reliability issues in areas of the country not served by the organized markets? Why have a rule that, at least according to PJM, could upset the organized markets when your problem is not in the organized markets, but it's in the remote areas or the rural areas or whatever area doesn't have an organized market? Why did they not consider the alternative? I use that word because that's another high principle of administrative law that there has to be consideration of. So this would be an alternative under which EPA would regulate engines in organized capacity markets differently than it would regulate engines located in other areas? That's right. If the only evidence supporting the need for or the justification of reliability is in the non-organized markets, then I can see an argument that you need to go up to 100 hours in those. That wouldn't by itself justify going up. Uniformity is nice, but it's not perfect value, and you have to weigh it against the cost of the environment. Why didn't they consider the alternative since that seems to be what you're now relying on? Well, first, Your Honor, this is an extremely complicated regulation of these engines in an extremely complicated area. Not enough to tell me it's complicated. That's what we'll sit here for all day long. You have to tell me why that alternative doesn't make sense. Well, what EPA promulgated here was a national standard and the idea that it could have somehow carved out exceptions for capacity. This would create quite a patchwork of... Well, they just did that for this remote area that Delaware just raised, right? That's one entire category of engines, Your Honor, as opposed to nothing... It's engines in remote access areas, right? That's what that one's for. That's correct. All right, so this would be engines in a non-organized market. That seems pretty easy to define. Well, I'm not sure it would be quite that easy, but the... This is the... I'm not following exactly why not. I mean, if the real problem here, for example, Delaware has put it to us, which is this transport problem from one place to another, and if many of the places, for example, on the East Coast are covered by RTOs and they're organized markets, and this doesn't really help for the organized markets but may increase pollution, why increase the hours in those markets when what you really need is another place that doesn't have an organized market? That seems to be what you're almost completely relying on now. This is what you also say in your brief, that this is the problem, the unorganized markets. And if that's the case, why not have a rule for those arguments for those markets? Well, so the 100-hour limit applies in two specific categories, either in the 5% voltage deviation situations or in the declared energy emergency alert level 2. In both of those situations, EPA doesn't specify that those criteria need to be met in any particular market. It doesn't specify anything about capacity markets. What it's saying is that whenever these conditions are triggered, that's an emergency use and that's an appropriate use of these emergency engines within the subcategory. You're following my question, though, right? My question is, since they don't respond to the arguments of PJM and the independent operator about those, assume for the moment that that's a problem. Why is it that they didn't consider, and since you rely, as you say here, that this decision was informed in large part by grid reliability issues in areas of the country not served by organized markets, why didn't you consider having a rule for those markets? I think EPA did consider that. There were comments in the record stating, just as you suggest, that EPA could have carved out different rules for different engines in different areas of the country. But what it said was that it was creating a nationwide rule. That's not an answer. Well, yes, that's it. It's not a reason. But it heard the comments to that effect. Hearing's not good enough. I mean, we don't have an administrative rule that says as long as you hear, that's enough. You have to explain why you're rejecting what seems like at least a reasonably logical alternative. Maybe it's not logical at all, but given your reliance so much on non-organized markets, why isn't there a reasonable rule? Do you have a reason why it's not a reasonable rule? I mean, yes, does EPA, standing here now, have a reason other than a desire for uniformity? Why? I think that is the primary rationale behind having a nationwide rule, is that uniformity is important for the regulated sources to be able to comply with. Why wasn't that enough for the remote areas rule? Why wasn't that enough to overcome the concern about the costs of going to those places and imposing the regular requirements on them? So the emergency engine subcategory covers many different types and categories of engines, whereas the subcategory you just mentioned covers a very specific type, engines above 500 horsepower, existing engines at area sources. It's a very specific type of engine that's covered, whereas the emergency engine subcategory includes numerous types of engines, all of which are regulated somewhat differently under the NSPS and the NESHAP. So to create a rule that would apply different criteria for emergency participation in non-organized capacity markets, I'm not sure that that would be workable. Well, but the agency didn't say that. All they said is we like uniformity. And it wouldn't even be enough to say it's not workable. You have to give a reason why it's not workable. You can't point me to any place where they explain why it wouldn't be workable. Standing here today, I can't point to a specific source in the record. And what is the agency's response to the argument by the independent system operator that this will create dynamic problems with respect to the operating capacity markets? Are you referring to the independent market monitor? Yeah. Which is different, I should note, from the system. It's not the grid operator. I know. We've had too many of these cases. Well, not in EPA, but in the FERC. Right, sure. The comment that this would create an increased reliance on emergency engines? Yes, because it would, as opposing counsels say, create a cost subsidy. More particularly, and I want to stress this because, to be honest, I only understood it with Mr. DeBruin's oral argument. The argument is that not only is there a cost subsidy, but that will create a temptation to underinvest in capacity of the regular sort, and therefore the number of emergencies will actually increase. In other words, it's not a, as I understand the argument now, it is not an argument that the RTOs will call emergency circumstances that were not emergency. They'll deliberately create more emergencies by cutting back on the more expensive, by hypothesis, the more expensive alternative, or actually regular sources. Right. So I suppose that's a possibility, and there are those comments in the record that that's going to be a consequence of the rule. But EPA's focus here under Section 112 was to, based on technology, cost, and availability, decide what's appropriate regulation for the subcategory of emergency engines. It's not to speculate about market consequences of- Well, except that the EPA relied on the proposition that there would not be a quantitative change in the use of- I want to strike that. There would not be a quantitative change in the hours of emergency as defined by EPA. That's correct. The contention here is that there will be a change in those hours, not through RTO reclassification of circumstances, but through deliberate RTO underpurchase of conventional capacity, capacity not covered by this rule. Right. So I think the issue, to some extent, is whether it's appropriate for EPA to speculate about such things and then- Well, if it's making a prediction, it seems to me it is speculating, and therefore it's speculation, although it's like any speculation. It's speculative. It should be done on the best analytical basis available. Now, I'm not sure how clearly this position was put forward. To me, it was not put forward clearly in the opening brief. That's right, and I think EPA thought the same thing when they were- Well, they were looking at these pages, 17-0306, which may or may not make it more clearly. So I believe EPA might have addressed this at J.A. 2581. This is in the response to comments document. 25 what, 81? 2581, yes, Your Honor. This is regarding the EPA's focus in this rulemaking, which was on regulation of the subcategory as opposed to becoming entangled in speculation about potential market consequences of this rule. But isn't-I think to go to Judge Williams' point, in order to-part of the basis of EPA's argument is that this is not going to increase the amount of pollution, right? It's not going to increase the hours. The rule isn't premised on the idea that there's not going to be increased hours or increased pollution. The rule is premised on what's appropriate during an emergency situation, which is not disputed. Petitioners don't dispute that the two situations are indeed emergencies, and that emergency engines are- The premise is that the quantity of emergency time is going to be static, right? I thought that was the premise. Not that it's going to be static necessarily, Your Honor, but that based on-  And-well, unchanged by this rule. That's right. As to the analysis of potential emissions from-potential for increased emissions. Right. So that requires some speculation about the future. That's the whole point. I mean, you call it speculation, you call it prediction. If it's only speculation, we can't- The environmental future I'm referring to. So the speculation about whether independent system operators will in the future rely more frequently on emergency engines. And that's a question really for the independent system monitor or independent system operators. For you, if you're relying on a vision of the future as impacted or not impacted by this rule. Can I ask you, along the same line, why did EPA not ask experts on this subject, namely FERC and NERC? Wouldn't you think that if the issue is about the reliability of the grid and the need to improve the capacity markets, why not request comments from the agencies that seem- they would be the ones we would normally-  the ones we would normally defer to, and I guess NERC derivatively? Yeah, that's right. I don't know that it's in the record, Your Honor, but I understand that EPA did ask FERC whether it wished to submit comments, and FERC declined to do so, presumably because it realized that what EPA was doing here wasn't treading on its authority. What EPA was regulating was the subcategory of emergency engines and what's appropriate for those engines, what's an appropriate use for those engines. Well, FERC's concerned with how the capacity markets work, isn't it? That's right. And EPA's rule is only partly concerned with how capacity markets work. And what about getting a view about the reliability, the impact on the reliability of the grid? The EPA's reliability determination here is really undisputed. It's that emergency engines support grid reliability. That's with real emergencies. It's clearly disputed as to whether these are necessary in the planning market. The reliability determination was that – I don't think it is – Delaware disputes that these are – that these near blackout situations and the two circumstances specified by the rule are emergencies. The other petitioners do not dispute that these are – that these near blackout situations are emergencies. And, in fact, they argue that they're competitors of these engines and they want to take the place of those engines to respond to those emergencies. So there's no dispute that these are emergencies that need to be addressed. Oh, right. That's not the question. The question is whether you need to get these into the planning market by giving them essentially a cost subsidy by reducing their environmental requirements. Well, again, Your Honor, I'm not – I would – I don't think that the characterization of what EPA's role here as a cost subsidy to the engines is correct. I think what EPA – again, what EPA was looking at was, is this an appropriate use – these two situations, is this an appropriate use for the subcategory of emergency engines? And if – What's the reason for having a subcategory in which you remove the environmental requirements? Well, so the subcategory was originally established back in 2004, so it's been around for a long time. What's the reason for removing the environmental – So the engines obviously are operated in a somewhat unique situation. They're only operated for short periods of time, and they are only operated on that limited basis, and they need to start quickly. So the EPA recognized that the cost associated – The cost, that's what I just said, the cost associated with the controls, right? Yes. Yes. But in this – the rulemaking issue here, EPA wasn't revisiting whether it's appropriate to have the subcategory at all. It was looking at whether – the contours of the subcategory, whether – Contours mean giving – removing the cost for more hours than they previously removed the cost. Isn't that right? From 15 to 100. Well, so the 15-hour limit, of course, never went into effect. So before this, there was no limit on the number of hours per year which these engines could operate. So it's not as if they were somehow increasing or removing the cost. There were no costs in effect. What if it were the case that it would have no consequence to the reliability of the grid in emergencies or otherwise if you left the controls on? Then EPA would be perfectly happy to leave the controls on, right? It just wouldn't hurt reliability. If it weren't for the problem of reliability, you'd leave the controls on, right? Well, for these engines, there aren't controls. The particular after-treatment controls the petitioners wish for them to have, they aren't on in the first place. Emission limitations. Okay. You wouldn't have – you wouldn't make an exception but for your concern about reliability. Isn't that right? That's the whole point. Isn't that right? Grid reliability was the primary basis. You have another basis. Not in organized capacity markets alone but in – Either one. Either one. And if FERC told you there is no – or NERC told you there is no reliability problem, then you wouldn't have done it. Presumably that's true, but there were no comments from either FERC or NERC indicating that that was the case. Why is that EPA's business at all? What's the – give me the logical progression through the statute to the proposition that EPA has authority to regulate on the basis of grid reliability. I believe under Section 112B, EPA is allowed to look at this type of consideration. It's supposed to look at the consequences of decisions. In the early days of the environmental movement, which I'm old enough to remember, a great accusation of environmentalists against general government agencies was they had so-called tunnel vision and they didn't look at the consequences of things. There, EPA looks at it, maybe erroneously, but it looks at the consequences. Is that right? It did, and I'm not sure – I guess I'm not following the question why grid reliability was not an appropriate thing for EPA to look at in the limited context of whether the use of emergency engines for the two specific purposes articulated in the rule. Looking at it is one thing, but regulating on the basis of EPA's view of what's needed for grid reliability is something else. My question is where does EPA get the authority to regulate on the basis of grid reliability? Not whether it can look at it. Of course it can look at it. I suppose what EPA did here was not to regulate grid reliability. Suppose we disagree with that. Suppose we look at the record here, and the petitioners disagree with that proposition. Suppose we look at the record and find that's exactly why EPA increased the number of hours from 15 to 100. Well, I think it's appropriate for EPA under Section 112 to look at cost, technology, and availability, and those are considerations relevant to grid reliability. Are there other questions? Thank you. Yes, sir. These are the intervener respondents. Excuse me, Your Honor. Represent the intervener respondents. Yes, Your Honor. My name is Bill Wareham. I'm here on behalf of the Gas Processors Association and the National Rural Electric Cooperative Association, and I'm here in support of the remote engine provisions that the State of Delaware has challenged. I'm joined at Council table today by Erin Flynn, my colleague at the firm. Your Honors, I'd like to make a couple of quick points to explain some context as to why this provision does make sense, contrary to Delaware's arguments, and why it's wholly consistent with the law. First of all, in response to a couple of the arguments made by Council for Delaware, the sole basis for Delaware standing in this case is a single-sentence assertion in their opening brief that Delaware's air quality is impacted by emissions from the engines covered by the NSPS and NESHAP that originate upwind. There is no further factual support for that assertion in the record. The State of Delaware attempted to provide additional support in its reply brief, but it's well established by this Court's rules and case precedents that evidence support at the time of the reply brief. I assume it's not well established because notwithstanding that we've said that in Sierra Club, in actually regulatory matters as compared to ones that arise up in the District Court, we have often relied on reply briefs and even supplemental submissions. So tell us why that... I'm not saying that's going to be the end of it, but tell me why what they said in the reply brief isn't good enough. Because with regard to the remote engine provisions that we're here to defend, there's nothing said in the affidavit supporting the reply brief  anywhere within the proximity of Delaware that may create even the possibility that any significant amount of emissions could drift into Delaware and create the kind of air quality problems that the State of Delaware is concerned with. Where are these engines located? For my clients, Your Honor, the Gas Processors Association operates thousands of miles of natural gas pipelines, and these pipelines traverse the country. Are they within the air transport area of Delaware? Yes, these pipelines do traverse the country. Then why don't they have standing? They presented substantial evidence. It doesn't have to be by preponderance, but they have certainly enough evidence for standing that they get transport by wind of emissions within that area. And if these pipelines are in that area and they're going to be not subject to the rule, why don't they have standing? Your Honor, they are subject to the rule, so this is not an out-and-out... It's a different question. That's your next point. I'm only on the standing question. Right, but determining whether there's a significant impact on downwind air, bad air quality, is a very difficult thing to do. The United States Environmental Protection Agency engages in extensive rulemaking, for instance, the Clean Air Interstate Rule, the so-called CASPER Rule, the Cross-State Air Pollution Control Rule, where they devote a tremendous amount of resources, technical resources and analysis, fact-gathering, and deciding what sorts of upwind sources are significantly contributing to downwind nonattainment. And there is no such analysis in the record here. So, yes, these engines and compressor stations are traversing this part of the country, but that doesn't mean that they're significantly contributing to bad air quality in the state of Delaware. What do you say on the substance? What do you say to the argument that NRDC versus EPA bars EPA from creating a low-risk subcategory? Apples and oranges, Your Honor. In NRDC v. EPA, the rule in question, EPA created a so-called low-risk subcategory, and for sources that qualified for the low-risk subcategory, they were wholly exempt. They were delisted from regulation under the Act. What this Court determined in that case is that the only way... First of all, the Court determined that the only way to delist anything under this part of the Act is through Section 112c9, and the Court analyzed the words of Section 112c9 and said that provision is limited to entire source categories and not subcategories. So in that case, the EPA's attempt to have a low-risk subcategory that was effectively exempted from the statute was found unlawful because EPA didn't follow the procedures of 112c9, which required the entire source category to be considered. So here we're not talking about exemption at all. EPA has created a subcategory, and that subcategory is regulated. EPA imposes work practice standards on these engines that are designed to make sure the engines continue to operate efficiently as they operate. So, you know, contrary to the State of Delaware's argument, they're not exempted at all. They're regulated. So the NRDC-PEPA case is wholly inapposite, Your Honor. So, and I see my time is up, if I may. I've got a minute. Thank you, Your Honor. A couple other points to make. I mentioned my clients operate pipelines. You've got to move gas through pipelines, so you have compressor stations. Compressors have to be run by something, and compressors are run, in our case, by the kind of engines that are covered by this provision.  They're big. They're greater than 500 horsepower. They're sparked ignition engines, so-called SI engines, which means they're not diesels. They're like your car engines. They run on gasoline. And in our case, they run off pipeline natural gas. So in order to move gas through the pipeline, they draw a little bit of gas off, and that's used as a fuel for the engines that drive the compressors. So the engines are a very specific kind of engine, and the State of Delaware hypothesized that maybe you could plunk one of these right down in the middle of Central Park in New York City, and it would be considered a remote. I think it's important to put this rule into context because- It's got to have a gas pipeline through Central Park. Well, that's exactly right, or some affiliated operation, and that's not going to happen. I hope not. That's right, Your Honor. A couple other points to make. You know, these facilities are unique. So natural gas pipeline compressor stations typically are not manned, so it's very unlike other facilities EPA regulates. They don't have staff on hand all the time. They often don't even have common utilities. They truly are remote in some cases. They don't even have electricity or water pressure sometimes. And because they're truly remote, it takes time to get to them if something breaks down and needs to be fixed, and they are sometimes inaccessible. Not all the time, but, you know, typically a bad weather event would be a good example where if there's a deep snow in the middle of wintertime, sometimes you just can't get to these facilities. So they're very different than what EPA otherwise regulates, and those differences, you know, wholly justify what EPA did here. EPA imposed work practices, and their work practices, on the one hand, do satisfy EPA's environmental control responsibilities because they assure a good and efficient operation of the engines. But on the other hand, it significantly simplifies compliance with the rule for my clients. I think now you're well over. Let me just ask anybody on the bench. Yeah, I just have one question. What's the consequence if you operate a backup generator for 110 hours? Do they have meters on them that show the hours of operation? Yes, they typically do. So what happens if you operate one for 110 hours? Well, Your Honor, the kind of engines I'm talking about are not time-limited as the emergency engines are that were previously discussed in this argument. So a natural gas compressor engine might run all the time or nearly all the time, and that's permissible under the rules. Oh, so that's fine with you. Right, so we're not talking about the demand response engines. We're talking about a wholly different kind of engine here. Thank you. Thank you so much. I assume Mr. DeBruin doesn't have any more time. We'll give you another two minutes. I think I can be very quick. Before you start being quick, is it correct what Mr. Saylor said, that before 2010 there was not an hour limit at all? Is that correct? Well, EPA has been in the process of regulating these diesel engines. And, again, just so the record's clear, there's two different arguments and different engines going on. So now we're back to diesel engines. Yes. EPA has been in the process for the last 10 years in regulating these diesel engines both at major sources, at area sources, different horsepowers, existing engines, new engines. So this regulatory system, as explained in the briefs, has been coming into play. In the 2009 proposed rule, EPA for the first time proposed a regulatory system for the diesel engines that we're talking about. And in that proposal they did not propose any exemption to allow these emergency engines to operate in an emergency demand response program, which is an economic program. They get paid for it. So comments were submitted that said, in essence, without some kind of exemption we can't even operate in an alert level 2. In the real-time energy market, because we get paid for that and there's no exemption. So then in the 2010 final rule, EPA allowed 15 hours of actual operation for these emergency engines. They exempted the engines from the pollution controls that they otherwise imposed on the engines. And no one disputes these are dirty engines. They should be controlled under the statute. And then in the 2013 rule they extended that to 100 hours. Can we go back to the period before 2009? At that point is it fair to say that these engines had the cost advantage that you are speaking of here and could participate in capacity markets? If you go back before 2009, you have to also take into effect that capacity markets that we're talking about, planning markets, did not really come into effect until just a little bit before that. So PJM's three-year ahead capacity planning market went into effect in 2007. So these engines were not able to participate in capacity markets because the capacity markets were introduced in 2007. And PJM, which I believe has been one of the leading markets. So what was the competitive situation in the period between 2007 and 2009?  One is the cost advantage. There's two different markets, so there is your capacity. I don't know that I could answer exactly in the period. Again, PJM has also changed its rules. Again, because emergency demand response, it's not actual electricity. It is a curtailment of use. So I believe when the capacity market was first introduced, what PJM sought to procure is commitments by generators that if we provide revenue to you, capacity revenue, you commit and promise you'll be there three years from now if we need you. We may not need you. They secure more capacity resources than they anticipate needing. So some resources are paid to make a commitment to be available. They may never be called upon, but demand response could not participate in those early capacity markets which were focused on supply generation. And over time, but more recently, capacity markets have allowed demand response to participate. This court's recent decision to give it a bottom line, I was interested in whether evidence in support of this sort of complex economic shift argument you were making could be found or contradicted in the period before 2009. And you're saying essentially the framework is sufficiently different that it couldn't. The ability of emergency demand response to participate in capacity markets is a more recent phenomenon. It is growing. And the point that I was making, which was only one point, was that as these engines now have essentially a subsidized cost benefit, they can beat out other types of resources, such as conservation-based demand response, which is true environmentally friendly because it means people stop using electricity, not just operating it behind the meter, but a factory agrees to shut down. There's a real cost in shutting down your factory when the grid is taxed. But people will pay. They'll say, well, if you'll give me a capacity revenue, a guaranteed capacity payment of X amount, it may be economically sufficient for me to shut down my factory for a time. So those kinds of demand response providers are competing against diesel engines saying, well, we'll operate behind the meter, and here's our bid in the planning market. And another conservation-based resources, here's our bid in the planning market. What EPA has done is said, we're going to create an exemption to allow the diesel engine to avoid environmental controls that otherwise should apply. And so what happens in the planning market is the diesel engine prevails, and other cleaner alternatives don't prevail. But to say that these are critical to avoid an emergency is a misnomer in the planning market because you're planning a certain amount of resources. I think I understand that completely. I'm trying to get at the basic and rather complicated market shift that your contention of actually leading to increased usage depends on. I appreciate that. There's really two points. We all agree that there will be a certain number of alert hours. You'll plan on a certain amount of capacity, but on a hot day, everyone's running air conditioners. So one problem is what's going to come forward when you hit that alert, and you need all of your resources running, what will be running? And so even if there's no increase in alert hours, what EPA's rule means is that you're more likely to use the diesel engines as opposed to conservation-based ER or even a nuclear plant, whatever otherwise might be used. That's one problem. Second problem is as the system relies more on demand response and less on actual generation, what the market monitor says is you're likely to actually have more alert hours because you have less generation in the system. We have to call upon people to cut back use or in sort of a little secret, not really cut back use, but to shift to diesel. So in all terms of historical evidence in this context, we have none one way or the other. Well, no, because this exemption that allows them to increase. We don't even have a close parallel as I have been trying to find out if 07 to 09 was possible. I don't believe that is correct. Now you did ask for us if there was any studies in the record, and one thing I wanted to point you to is when Calpine submitted their comments, and this is in the appendix, the joint appendix 2388, it commissioned and submitted a very detailed economic analysis by the analysis group, and that begins at joint appendix 2388. And I believe it addressed as many of the questions you've asked about whether there's further economic support besides the comments of Mr. Bowring. The second thing I wanted to say to you is if you look at 1703 to 1706, you'll see that it's just an excerpt of what was a very lengthy hearing. And in fact, 1703 picks up in the middle of Mr. Bowring's testimony. It doesn't begin with the beginning. Well, we have six lines. We have six volumes of a joint appendix as it is, but of course the entire hearing transcript is in the administrative record. It's all available. The index to that record is at the beginning of the joint appendix. It's all at EPA. It's online. If you look at it, you're going to – where's the first page? I took up more than your two minutes, so I think that Garlick will give it back to you. Yeah. Talk fast. All right. Two quick points. One, EPA says that this rule is not intended for capacity markets. Again, that's what they said. They cite the number of hours. And critically, those hours requirements only exist for the capacity market, not the energy market. And that is in the joint appendix. The EPSA comments at 2228 and the CLF comments at 2105. And the last thing I'll say is, again, FERC typically does not participate in these proceedings because, again, what EPA's focus generally is, is what kind of environmental controls are appropriate for the source of that issue. Here we have a diesel engine. And then FERC and its counterparts deal with whatever environmental controls are appropriate under the Clean Air Act by making sure that the system, the electric system, which FERC is responsible for, in fact, adapts to make sure that there's adequate power. And that's exactly what EPA did in Matt's rule that we cite in our papers when they imposed restrictions on coal plants. Obviously, EPA has imposed extensive restrictions on coal plants. The nation has been very dependent on coal-generated power. And the argument was, well, if you put these restrictions on, what's going to happen? Well, FERC took care of that because that's FERC's side of the house. EPA appropriately imposed requirements on the coal plant. They deviated from that rationale here with no explanation. And that is another reason why we believe the rule is overturing commercial systems should be set aside. Could FERC take care of it by providing more money to the diesels? No. What FERC said is the energy markets are competitive. There's adequate supply from other sources. And if a dirty coal plant cannot compete because the cost of the energy is too high, or it's an emergency situation, what could FERC do if, maybe the purest version of your theory, they would leave everything on and then it would go to FERC? They would leave the environmental controls on and go to FERC. And FERC would say, well, this is terrible. Imagine FERC said you can't have a reliable grid this way. What could FERC then do? Well, I think you've put, I think, your finger on the pulse. We have never challenged the operation of these engines without any environmental control when needed in a blackout state. No limit on the number of hours we've never challenged. What if FERC were to say we can't get to that without having them in the planning market, too? That is, it won't work to have them only available the minute there's an emergency. We need to have them in the planning. That hypothetical fit is directly contradicted by all the evidence in the record that the planning market, there's ample supply, and it's simply a question of which is most efficient, and there's no need for EPA to put its foot on the scale, particularly in favor of dirty diesels as opposed to other resources that can provide the same amount of electric reliability. We don't dispute that EPA, when it imposes environmental controls, is entitled to consider the consequences of its actions, including energy consequences. I believe that's right in the Clean Air Act itself. But again, when it does that, it has to do so in a rational way. It can't do it in an arbitrary and capricious way. That's our argument here, is that in considering the energy effects of its rule and exempting these engines, it acted based on a belief of a need to create these resources for reliability that the record, PJMDIMM, showed was not true, and EPA did not respond or in any way address those comments. Okay, thank you. I think we still have to hear from Delaware, right? I take it she also has no more time? Okay. How about if I ask you two questions? Sure. The first one is on the remote listing, the remote areas. I'm sorry, on the low risk, on the theory that it's inconsistent with NRDC versus EPA. Yes. I see that in the reply brief. I didn't see it in the opening brief. Is this an argument that was raised originally? It's the same argument. That particular case was not cited, but the argument being that EPA was exempting, unlawfully exempting these sources from the— In the opening brief, the argument was it was arbitrary and capricious for it to do it, not that it was beyond its jurisdiction. That's your argument with respect to NRDC, right? Perhaps it wasn't as articulated as clearly in the opening brief. Okay. And then secondly, what about opposing counsel's argument that NRDC is about total delisting of a category, and that's not what's happening here? It was not total delisting, but it is the same logical extension of what EPA has done. EPA set a rule and then seeks to exempt it from controls. As counsel pointed out, the gap that was substituted from controls that were known to be cost-effective was engine maintenance so that the engine will run well. It has nothing to do with emissions control. If I could just address the standing question very quickly. Yes, of course. Yes, Your Honor. This is just on the remote area question. That's one they raised, so if you want to respond to that, that would be great. Yes. Part of Delaware's belief that standing is self-evident is based on the fact that the remote area exemption applies in Delaware. The Clean Air Act is the federal-state partnership that Delaware implements and enforces the rules that EPA sets for the NESHAP. It applies directly in Delaware. And while Delaware didn't do an exhaustive inventory of where you can stick a pen, draw a quarter-mile circle, and see how many buildings are around it, I'm sure that there are likely to be instances where a person could take advantage of that in addition to the transported pollution. Does that run into the problem that Delaware can impose its own restrictions? Well, we can impose our own restrictions, but that causes us to have to undertake additional administrative action when EPA is failing to do what it's required to do. And I take it you also are talking about being air transport area? Yes. Other questions from the bench? Okay, we'll take the matter under submission, and we'll take a brief break while the next parties move up.